[Cite as *State v. Gigliotti*, 2025-Ohio-5470.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## GEAUGA COUNTY

STATE OF OHIO,

        Plaintiff-Appellee,

- vs -

AGOSTINO GIGLIOTTI,

        Defendant-Appellant.

CASE NO. 2025-G-0017

Criminal Appeal from the
Court of Common Pleas

Trial Court No. 2023 C 000046

---

## OPINION AND JUDGMENT ENTRY

Decided: December 8, 2025
Judgment: Affirmed

---

*James R. Flaiz*, Geauga County Prosecutor, and *Nicholas A. Burling*, Assistant Prosecutor, Courthouse Annex, 231 Main Street, Suite 3A, Chardon, OH 44024 (For Plaintiff-Appellee).

*Edwin J. Vargas*, The Vargas Law Firm Co., L.P.A., P.O. Box 6484, Cleveland, OH 44101 (For Defendant-Appellant).

EUGENE A. LUCCI, J.

{¶1} Appellant, Agostino Gigliotti, appeals his conviction for intimidation of a witness in a criminal case. We affirm.

{¶2} In 2023, Gigliotti was indicted on one count of intimidation of a witness in a criminal case, a third-degree felony, in violation of R.C. 2921.04(B)(2). Gigliotti pleaded not guilty. Just before trial, Gigliotti waived his right to a jury. Following a bench trial, the trial court found Gigliotti guilty, referred him to the probation department for the preparation of a presentence investigation report, and set the matter for sentencing.

Thereafter, the court sentenced Gigliotti to three years of community control, including six months of residential community control in the Geauga County Safety Center.

{¶3} In his two assigned errors, Gigliotti argues:

{¶4} "[1.] The verdict is against the sufficiency of the evidence.

{¶5} "[2.] The verdict is against the weight of the evidence."

{¶6} The question of whether sufficient evidence supports a conviction "is a test of adequacy," which we review de novo. *State v. Thompkins*, 1997-Ohio-52, ¶ 23. "In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *State v. Dent*, 2020-Ohio-6670, ¶ 15, citing *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶7} Unlike the standard for the sufficiency of the evidence, the "[w]eight of the evidence concerns 'the inclination of the *greater amount of credible evidence* . . . to support one side of the issue rather than the other.'" (Emphasis in original.) *Thompkins* at ¶ 24, quoting *Black's Law Dictionary* (6th Ed. 1990). When considering challenges to the weight of the evidence, an appellate court reviews "'the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [fact-finder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at ¶ 25, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "'The discretionary power to grant a new trial should be

exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at ¶ 25, quoting *Martin* at 175.

{¶8} Thus, a conclusion that a conviction is supported by the weight of the evidence necessarily includes a determination that the State produced sufficient evidence in support of the conviction. *State v. DiBiase*, 2012-Ohio-6125, ¶ 38 (11th Dist.); *State v. Pesec*, 2007-Ohio-3846, ¶ 44 (11th Dist.).

{¶9} Here, Gigliotti was convicted of intimidation of a witness in a criminal case, in violation of R.C. 2921.04(B)(2), which provides:

> No person, knowingly and by force or by unlawful threat of harm to any person or property or by unlawful threat to commit any offense or calumny against any person, shall attempt to influence, intimidate, or hinder any of the following persons . . . [a] witness to a criminal or delinquent act by reason of the person being a witness to that act. . . .

{¶10} Pursuant to R.C. 2901.22(B), "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature."

{¶11} Here, in support of the charge, at the bench trial, the State's evidence included the testimony of an alleged recipient of the threat ("Maria"), her daughter ("Lori"), and a translator for the FBI.

{¶12} Maria testified that she was born in Calabria, Italy, and speaks English and Italian with a Calabrian dialect, the latter being her primary language. After Maria's uncle, Tony, passed away, Maria was appointed the executor of his estate. During her work on the estate, she consulted with an attorney who discovered suspicious activity by Maria's 88-year-old uncle, Gino, as well as by Gino's son and daughter, who is married to Gigliotti.

Based on the attorney's discovery, criminal charges were brought against Gino and his children.

{¶13} On March 3, 2023, Maria learned that Gino, who was living in Naples, Florida, was taken into custody. Later that night, Gigliotti, who is from the same town in Italy as Maria, left a message directed to Maria and her husband on Maria's family business' answering system. Gigliotti spoke Italian with a Calabrian dialect on the message. Maria understood the message to include insulting statements about her daughter, Lori, and an assertion to the effect of "if Gino would not get out of jail, that he found somebody or he would talk to somebody in the Calabrese way, that he was going to pay for it." To Maria, this meant that Gigliotti would send someone to kill or hurt them.

{¶14} Maria's daughter, Lori, testified that English is her first language, but she learned Italian with a Calabrian dialect as a child because her parents and grandparents were from that region. After Tony passed away, Lori accompanied Maria to her attorney for administering Tony's estate. The attorney discovered that Gino and his children had inappropriately used Tony's funds. The attorney reported this to law enforcement, and charges were filed. Lori indicated that she listened to the voicemail that Gigliotti left on her family's business line because she was at Maria's house when they learned of the message. Lori recollected:

> He started out addressing the voicemail to my parents, and he then stated who he was.
>
> And he then stated that he was calling because his father-in-law, Gino . . ., had been arrested and was in the Naples jail cell.
>
> He then stated that if we thought by chance if Gino's brother, Tony . . ., the one who passed away, wanted this to happen, obviously, we would be sick in our minds.

Case No. 2025-G-0017

He then went on to stating that, um, he went on by starting calling myself names. Basically stating to my parents that he told my father that how could he let my mother, who was not worth anything, do these type of things, and the daughter that he had, obviously myself, um, who was ugly as a witch, and that would make them pay, that Jesus Christ made them pay from the day that I was born, how could he let them do such a thing.

{¶15} Lori further testified that Gigliotti indicated in his message that "he's already made the call to somebody to whisper in the ear, he's made the call," and "[h]e's not going to start with them, meaning my parents." Lori maintained that "from that point, obviously, um, he states that he's not afraid of anyone. Call whoever you want. He's not afraid of anyone or anything. He's climbed all mountains. Um, he's never done anything to anyone. He basically states that we are jealous people . . . ." Lori stated that "[m]aking a whisper, calling someone else to do the dirty work for you is basically a mob hit here in America."

{¶16} Both Maria and Lori authenticated a thumb drive, marked as an exhibit, affirming that the thumb drive contained a copy of Gigliotti's voicemail message. Their testimony indicates that the responding officer did not understand the message, and Maria and her family relayed to the officer what Gigliotti had said. Lori testified that she was shaken by the message and believed that Gigliotti had stated that Lori was "dead like a witch." She later said he called her "[u]gly, dead like a witch," but she did not believe that part of the translation mattered.

{¶17} A translator for the FBI testified as an expert in this case. The translator indicated that she speaks five languages, including Calabrese, which she stated is a rare dialect. Her work focused on this dialect because she was born in Calabria. The translator confirmed that she translated the message in the case verbatim as follows:

Case No. 2025-G-0017

Dear Marisa, dear Pietro, if you think that this Ntonio [Antonio] is who he wanted for his brother, you are sick in the head.

I am calling you because I am not afraid of anything. You can send whoever you want to see me because I have never really wronged anyone.

You people have been jealous, crappy people you are. Always thinking you are above everyone else. You are nothing.

Your monster of a daughter, a monster that is worse than a witch, God has made you pay for it since was born. You better believe it.

If anything happens to my father-in-law before he comes home legally, we will have to deal with things like someone does before they die.

I gave you little warning and that is where it starts. And you will not be the first to pay for it.

Now, I would like to do things with you like the Calabrese way. At this point, this is where we are.

You call whomever you want, where I have been, I have always dealt with ups and downs.

Pietruzzo [Pietro] My father has always respected your family, my father. How dare you let your witch of a daughter do something like that?

Your wife has nothing to do with this, and nor do you.

We are good people, we are immigrants, hard workers, and we have never wanted to know anything about anyone else's money.

(Bracketed text in original.)

{¶18} After the State rested, Gigliotti moved for an acquittal pursuant to Crim.R. 29, which the trial court denied. The defense then rested without putting on evidence and

renewed the Crim.R. 29 motion. The trial court again denied the motion. Thereafter, the trial court found Gigliotti guilty.

{¶19} On appeal, Gigliotti, relying on *State v. Cress*, 2006-Ohio-6501, maintains that nowhere in the message did he make any demands of a witness, and therefore the State failed to provide proof of an unlawful threat. He further maintains that the evidence indicates that the message was intended as a plea of concern for Gigliotti's elderly father-in-law. Moreover, Gigliotti maintains that the only witnesses that imputed a threatening intent to the message had monetary interests in the matter.

{¶20} However, *Cress* does not stand for the proposition that a demand is an element of intimidation of a witness in a criminal case. Instead, *Cress* addressed the meaning of an "unlawful threat of harm" as used in R.C. 2921.04(B) and held that "intimidation by an 'unlawful threat of harm,' is satisfied only when the very making of the threat is itself unlawful because it violates established criminal or civil law." *Cress* at ¶ 42. "For example, where the making of a threat constitutes the offense of coercion, in violation of R.C. 2905.12, a misdemeanor, that offense would serve as a predicate offense for the crime of witness intimidation as proscribed by R.C. 2921.04(B), a felony." (Footnote omitted.) *Cress* at ¶ 42.

{¶21} As the State notes in its answer brief, the underlying threat alleged in this case was unlawful as it constituted menacing pursuant to R.C. 2903.21, which provides that "[n]o person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person . . . or a member of the other person's immediate family."

Case No. 2025-G-0017

{¶22} As set forth above, Maria and Lori, who maintained their fluency in Calabrese, testified that they understood Gigliotti's message, in which he spoke in Calabrese, as indicating that he had arranged for someone to harm their family because of Gino's arrest. As to Gigliotti's challenge to the credibility of Maria and Lori, although Maria testified that she is the executor of Tony's estate, it is not clear from the record that she or her daughter had any monetary interest in prosecuting Gigliotti. Regardless, the trial court was in the best position to judge the credibility of witnesses, and we generally defer to the fact-finder's credibility determinations. *State v. Fiederer*, 2020-Ohio-4953, ¶ 13 (11th Dist.).

{¶23} Moreover, the trial court noted that the verbatim transcript of the message includes phrases that support that Gigliotti knowingly attempted to intimidate Maria through an unlawful threat. In an order entered following trial, the court noted:

> Upon listening to the recording and reviewing the translation, the Court finds the statements of [Gigliotti], taken in context with the remainder of the message and the legal circumstances surrounding his father-in-law, wife and brother-in-law, the Court finds that [Gigliotti's] statements: ". . . You better believe it. If anything happens to my father-in-law before he comes home legally, we will have to deal with things like someone does before they die. I gave you a little warning and that is where it starts. And you will not be the first to pay for it . . ." Later he states ". . . How dare you let your witch of a daughter do something like that . . ." The Court finds that these statements, taken in context with the remainder of the message, were a threat of harm and were intended to influence or intimidate a witness to a criminal act by reason of that person being a witness to that act.
>
> Regarding whether [Gigliotti] made these threats knowingly, at the beginning of the message he says ". . . You can send whoever you want to see me because I have never really wronged anyone." And toward the end of the message, he says "You call whomever you want; wherever I have been, I have always dealt with ups and downs." Based on these

Case No. 2025-G-0017

statements, the Court finds that [Gigliotti] knew that [Maria and her] family would perceive this message as a threat, and he expected that they would be compelled to take further action.

{¶24} We agree with the trial court that a reasonable inference can be drawn from the evidence that Gigliotti knowingly, and by unlawful threat of harm to Maria and her family, attempted to influence or intimidate Maria, a witness to the criminal cases against Gino and his children. *See Jenks*, 61 Ohio St.3d 259, at paragraph one of the syllabus ("Circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof. When the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction.").

{¶25} After review, we cannot say that this is the exceptional case where the conviction was against the weight of the evidence. Therefore, the conviction was necessarily supported by sufficient evidence.

{¶26} Gigliotti's assigned errors lack merit.

{¶27} The judgment is affirmed.

MATT LYNCH, J.,

SCOTT LYNCH, J.,

concur.

Case No. 2025-G-0017

# JUDGMENT ENTRY

For the reasons stated in the opinion of this court, appellant assignments of error lack merit. It is the judgment and order of this court that the judgment of the Geauga County Court of Common Pleas is affirmed.

Costs to be taxed against appellant.

_____
JUDGE EUGENE A. LUCCI

_____
JUDGE MATT LYNCH,
concurs

_____
JUDGE SCOTT LYNCH,
concurs

---

**THIS DOCUMENT CONSTITUTES A FINAL JUDGMENT ENTRY**

A certified copy of this opinion and judgment entry shall constitute the mandate pursuant to Rule 27 of the Ohio Rules of Appellate Procedure.

---

Case No. 2025-G-0017